C. H. LEAVELL & COMPANY, a Texas corporation, and River Construction Corporation, a Delaware corporation, a Joint Venture, and Allison Steel Manufacturing Co., an Arizona corporation, Appellants,

v.

FIREMAN'S FUND INSURANCE COMPANY, a California corporation, Appellee.

No. 21180.

United States Court of Appeals Ninth Circuit.

Feb. 13, 1967.

Rehearing Denied April 28, 1967.

Mark Wilmer, of Snell & Wilmer, Phoenix, Ariz., for appellants.

Philip A. Robbins, Craig R. Kepner, of Moore, Romley, Kaplan, Robbins & Green, Phoenix, Ariz., for appellee.

Before HAMLEY and JERTBERG, Circuit Judges, and BYRNE, District Judge.

BYRNE, District Judge:

This is an appeal from a decision of the District Court denying recovery to plaintiffs on an insurance policy.

Jurisdiction of the District Court is based on 28 U.S.C. 1332, and jurisdiction of this Court is conferred by Section 1291, Title 28, U.S.C.

The cause, as to liability of appellee, Fireman's Fund Insurance Company, was submitted to the District Court for decision on an "Agreed Statement of Facts", and several exhibits which were received in evidence. The agreed facts may be summarized as follows:

On or about November 28, 1961, C. H. Leavell & Company and River Construction Corporation, as a joint venture, (hereinafter referred to as "Leavell"), contracted with El Paso Natural Gas Company to construct and erect a single span pipeline suspension bridge over the Flaming Gorge Reservoir in Wyoming, near Dutch John, Utah. On or about December 1, 1961, Allison Steel Manufacturing Co., (hereinafter referred to as "Allison") entered into a subcontract with Leavell, under which subcontract Allison contracted to supply the required materials and construct and erect the bridge.

The specifications and design pursuant to which the bridge was to be constructed were prepared by or under the direction of El Paso Natural Gas Company and accompanied the "Invitation to Bid", which El Paso tendered to Leavell. They were submitted to Fireman's Fund Insurance Company (hereinafter referred to as "Fireman's Fund") prior to the time it executed the insurance policy upon which this suit has been brought.

Upon the award of the contract by El Paso to Leavell, Leavell applied to Fireman's Fund for a policy of insurance in favor of Leavell "For their account and/or the account of their Subcontractors" and Fireman's Fund issued its "Bridge Builders All Risks" Form insuring said insureds in the sum of $767,-206.00 on property described as "Single Span Suspension Pipeline Bridge to be located over the Flaming Gorge Reservoir." This policy of insurance was a form policy prepared by Fireman's Fund.

Allison prepared and submitted to Leavell drawings and erection procedure plans detailing and showing how Allison proposed to accomplish the construction and erection of the bridge for approval by Leavell. These plans and erection procedure drawings were not included with the Plans and Specifications shown to and considered by Fireman's Fund prior to the execution and delivery of the policy of insurance by said Company.

The Plans and Specifications for the bridge called for the erection of a high, generally "H" shaped tower on each side of the Flaming Gorge Reservoir supporting a set of 6 "main" cables anchored to the ground substantially back from the base of each tower and strung over the top of the tower across the Reservoir Gorge to the top of the opposite tower and, in turn, anchored in the ground substantially back from the base of the tower. These cables were 2¼" in diameter and served to support the pipeline across the Flaming Gorge Reservoir as suspended by suitable attachments from and below these main cables. A second set of cables was also called for by the Plans and Specifications known as "wind boom" cables. These cables, two in number, served the purpose of stabilizing the towers against the force of the wind. These wind boom cables were 2¾" in diameter and substantially heavier in weight than the main cables.

Since the main cables rested on the top of the tower it was necessary for Allison to devise a means for lifting each cable to move it to its permanent resting place. A form of derrick was designed and constructed by Allison in its plant in Phoenix for this purpose. This derrick consisted of a steel beam at one end of which provision was made for bolting it to the top of the tower, (one derrick to be fastened at each corner of the tower) so that it extended up from the top of the tower, in appearance in place like an extension of the steel beam constituting the side of each tower. At the other end of this beam a piece of steel was welded at right angles to the beam giving the derrick, in place, the appearance of an inverted "L". At the end of this steel piece so welded to the steel beam there was a hole so that a block and tackle could be fastened to this end and employed to lift and move each main cable into place.

These derricks as designed by Allison were intended to be used only for lifting and moving the main cables and they were not designed or intended for use in lifting and placing the wind boom cables in position or in lowering the booms into place horizontally. The erection procedure drawings and instructions as prepared by Allison directed the use of these derricks only in lifting and placing the main cables.

The erection procedure drawings and instructions provided that the wind boom cables were to be lifted and positioned through use of a block and tackle attached to the corner of the tower at the top of the tower.

Allison's workmen, after positioning the main cables through use of these derricks, then attempted to also use one of these derricks to position the wind boom cable on the boom and to lower the boom into place. Due to the fact that the weld fastening the steel to the steel beam leg of the derrick (being the steel plate to which the block and tackle was attached) was defective, the fact that the derrick was not designed for the heavier load of the larger wind boom cables, and the amount of strain due to the greater angle of pull against this steel plate, the weld gave way and the wind boom cable fell to the ground, shearing off the wind boom from the tower and causing other extensive damage to the tower and the cable itself.

The reason the workmen did not follow Allison's erection procedure and drawings in attempting to position this wind boom cable has not been established. The derricks were to have been removed from the top of the tower when they had served their purpose as they were not a part of the permanent installation.

■ An "all risks" policy creates a special type of coverage extending to risks not usually covered under other insurance, and recovery under an "all risk" policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, *unless the policy contains a specific provision expressly excluding the loss from coverage.* (See "Coverage Under 'All Risks' Insurance", Annot., 88 A.L.R.2d 1122, 1125 (1963)).

The "Bridge Builders All Risks" policy with which we are here concerned was a form policy prepared by Fireman's Fund and included the following provision:

"4. This policy shall be void unless otherwise provided by agreement in writing added hereto, if:

(a) The general design or method of construction be materially altered or changed during the policy term;"

It is upon this exclusionary clause that the appellee relies, and it was this clause which persuaded the District Court in its conclusion "that this loss occurred during a period of time when the policy was not in effect because the use to which the derrick was put to lift the wind boom cables constituted a material alteration or change in the method of construction."

The appellee argues that the "general design or method of construction" includes not only the design and method of construction embodied in the Plans and Specifications prepared by El Paso and submitted to Fireman's Fund prior to its issuance of the policy, but also

includes such working plans, drawings and erection procedures as might be worked out by the Contractor from time to time as the work progressed.

To support its argument, the appellee directs attention to Section 2.1.8 of the Plans and Specifications prepared by El Paso which provides:

"The Contractor shall prepare such construction plans as are necessary to show in detail the temporary work and methods of construction he proposes to use. In order to satisfy the Engineers that the Plans and methods he proposes using in constructing the work will furnish *a completed Work in strict accordance with the Plans and Specifications,* and within the time limits required, the Contractor shall submit complete prints of such plans to the Engineers, in triplicate, *for examination and possible comments.* Such examination and comments by the Engineers shall not relieve the Contractor of any of his *responsibility to complete the work in strict accordance with the Contract, Plans and Specifications.*" (Emphasis added)

■ This provision does not require approval by El Paso's Engineers, of Allison's plans for erection procedures and temporary work, as contended by Appellee. It merely provides that copies of such plans shall be furnished the Engineers for "examination and possible comments". Of even greater significance is the obvious distinction made between Allison's plans for "temporary work and methods of construction" and *the* Plans and Specifications prepared by El Paso's Engineers which are the basis of the general design and method of construction to which all *completed* work must conform. El Paso seeks assurance that Allison's "plans and methods" for temporary work will furnish a *completed work* in strict accordance with *the* Plans and Specifications, and that their Engineers' examination of Allison's plans and methods of construction shall not relieve Allison of its responsibility to *complete* the work in accordance with *the* Plans and Specifications.

■ We hold that the "general design or method of construction" within the contemplation of the contracting parties and referred to in the exclusion clause of the policy was the *general* design or method of construction embraced in the Plans and Specifications prepared by El Paso. These Plans and Specifications accompanied the "Invitation to Bid" and were the basis of the contract between El Paso and the Contractor. As far as the record shows, they were the only plans and specifications or drawings that ever came to the attention of Fireman's Fund. This general design or method of construction was never altered or changed and apparently the contractors *delivered the completed bridge to El Paso in strict accordance with the general design or method of construction.*

It would be absurd to say that temporary working plans and erection procedures could not be altered or changed during the course of the work. Exigencies created by the weather or other atmospheric forces might well require alterations or changes in the temporary work to meet conditions of the moment. There is nothing in the Plans and Specifications or the Contract between El Paso and the Contractor which would prevent such alterations or changes. What is required is that the completed work be in strict accordance with the Plans and Specifications.

In its Conclusions of Law the District Court stated:

"* * * the workmen's acts are imputed to the employer, and, therefore, the employer is bound by the intentional deviation from the designated construction plans that occurred here."

■■ This is an apparent reference to the doctrine of respondeat superior under which the employer is responsible for want of care on the employee's part toward those to whom the employer owes a duty to use care, but it is not applicable here. If a third person had been injured by the falling cable, and were seeking recovery from Allison, the doctrine would apply. If, by reason of the negligence of

his employee, a truck owner's truck caught on fire and burned a farmer's barn, the negligence of the employee would be imputed to the truck owner in an action by the farmer to recover from the truck owner, but it does not follow that the truck owner could not recover from his insurance company for the loss he suffered.

Section 1.1.27 of the Plans and Specifications provides: "Until the acceptance of the work by the Company, it shall be under the charge and care of the Contractor, and he shall take every necessary precaution against damage or injury thereto by the action of the elements or from any other cause whatsoever, * * * The Contractor shall rebuild, restore and make good at his own expense, all damages or injuries to any portion of the work occurring prior to its completion and acceptance."

It would be folly to undertake such a contract without insurance against any fortuitous loss that might occur by reason of the elements, the negligence of employees (such as occurred in the instant case), "or from any other cause whatsoever". This is precisely why the Contractor obtained the "All Risk" insurance policy.

Negligence on the part of the insured or his employees is no defense against his recovery for the loss he has suffered. Federal Ins. Co. v. Tamiami Trail Tours, 117 F.2d 794, 796 (CA 5); Central Manufacturers Mutual Ins. Co. v. Elliott, 177 F.2d 1011, 1012 (CA 10).

The District Court thought, "not having seen these plans, or having written them, the defendant is not bound by the usual rule applicable to insurance policies, namely: that the language of a policy is construed most strongly against the insurance company issuing the policy". *It is the insurance policy, not the plans, which must be construed by the court.* The reason for the rule that the language of a policy is construed most strongly against the insurance company is that the insurance company is responsible for the wording of the policy. Mu-

tual Ins. Co. v. Hurni Packing Co., 263 U.S. 167, 174, 44 S.Ct. 90, 68 L.Ed. 235; Stipcich v. Metropolitan Life Insurance Co., 277 U.S. 311, 322, 48 S.Ct. 512, 72 L.Ed. 895; Kershner v. United States, 215 F.2d 737, 739 (CA 9); Allstate Insurance Company v. Erickson, 227 F.2d 755, 757 (CA 9); Prudential Insurance Company of America v. Barnes, 285 F.2d 299, 301 (CA 9). "The rule has particular application where exclusions are involved", Matsuo Yoshido v. Liberty Mutual Insurance Co., 240 F.2d 824, 826 (CA 9).

The appellants are entitled to recover on the policy for the damages sustained as a result of the wind boom cable falling.

The judgment is reversed and the case remanded for further proceedings.